THE NEW YORK STATE SOCIETY
OF CERTIFIED PUBLIC AC-
COUNTANTS, Plaintiff,

v.

ERIC LOUIS ASSOCIATES,
INC., Defendant.

No. 99 Civ. 3030(LBS).

United States District Court,
S.D. New York.

Dec. 2, 1999.

Mark Skolnick, Skolnick, Hochberg & Bernfeld, P.C., New York, NY, David B. Bernfeld, Skolnick, Hochberg & Bernfeld, P.C., New York, NY, Richard M. Ballerini, Gerald H. Kiel, McAulay, Nissen, Goldberg, Kiel & Hand, L.L.P., New York, NY, Mark Montague, McAuley, Nissen, Goldberg, Kiel & Hand, L.L.P., New York, NY, for Plaintiff.

Ira A. Finkelstein, Tenzer Greenblatt LLP, New York, NY, for Defendant.

## *OPINION*

SAND, District Judge.

Plaintiff The New York State Society of Certified Public Accountants ("the Society" or "Plaintiff") commenced this action against Defendant Eric Louis Associates ("ELA" or "Defendant") on April 27, 1999, asserting causes of action for (1) trademark/servicemark infringement, false designation of origin, and unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (2) trademark/servicemark dilution under § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); (3) trademark/servicemark dilution under New York General Business Law § 360–1; and (4) copyright infringement under § 101 *et seq.* of the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* On the same date, the Society moved for a preliminary injunction, and applied for and was granted a temporary restraining order. After two adjournments, a hearing on the Society's preliminary injunction motion was set for May 24, 1999. On that date, counsel orally stipulated to entry of an order of permanent injunction, and the Court issued such an Order on June 1, 1999.[1] The Order

---

1. The Order permanently enjoined ELA from:

 1. using all or any part of a Uniform Resource Locator (URL) with the name NYSSCPA or NYSSCPA.COM or any similar designation; and
 2. referring to on its web site (that uses domain names www.ericlouis.com and www.eric-louis.com), or on any other web sites that it may establish or in any advertising or promotion of its web site, or otherwise in commerce, the name NYSSCPA or any similar designation; and
 3. referring to on its web site the name NYSSCPA or any similar designation as a hyperlink to plaintiff's web site, or otherwise providing a hyperlink to, or framing of, plaintiff's web site; and
 4. representing by any means whatsoever, directly or indirectly, that any services or products offered or provided by it are offered or provided by the plaintiff, or are authorized, sponsored, licensed, endorsed, promoted or condoned by the plaintiff, or are otherwise affiliated with or connected to the plaintiff; and
 5. taking any action that would dilute any of plaintiff's trademarks or servicemarks; or infringe upon any of plaintiff's copyrights; and
 6. taking any action calculated to or likely to cause confusion, deception or mistake on the part of consumers or the

authorized the Society to apply for an award of monetary damages and/or attorneys fees by June 25, 1999. Presently before the Court is (1) the Society's application for an award of attorney fees under § 35(a) of the Lanham Act, 15 U.S.C. § 1117(a); and (2) the Society's motion for discovery and a hearing pursuant to an application for an award of damages, infringer's profits, costs, and/or attorney fees under §§ 504(b) and 505 of the Copyright Act, 17 U.S.C. §§ 504(b), 505.

This application for attorney fees and damages comes to the Court in an awkward procedural posture. Faced with Plaintiff's motion for a preliminary injunction, Defendant chose to forego briefing and a hearing on the claims of liability raised in that motion–deciding instead to consent to an order permanently enjoining Defendant from continuing the actions that, according to Plaintiff, were violative of Plaintiff's servicemark and copyright. Furthermore, Defendant's formal consent to that order is replete with disclaimers of liability.[2] Similarly, Defendant's submissions in opposition to Plaintiff's application for damages and attorney fees contain numerous denials of liability.[3] Finally, as is discussed more fully in Sections I and II below, a determination that a prevailing plaintiff in a trademark action is entitled to attorney fees requires a determination that the defendant's infringing or diluting conduct was willful or tinged with bad faith. This latter determination obviously presupposes an initial finding of infringement and/or dilution.

Taken together, the preceding considerations raise the question whether the Court can simply infer Defendant's liability on Plaintiff's underlying infringement and dilution claims from Defendant's consent to the permanent injunction–thereby ignoring Defendant's disclaimers of liability–or, instead, is obliged to decide these liability issues.

Unfortunately, however, there appears to be no clear, direct legal authority on this question, and the legal rules bearing on it indirectly point in conflicting directions.

We begin with three Federal Rules of Civil Procedure. First, Federal Rule of Civil Procedure 65(d) provides in relevant part that "[e]very order granting an injunction ... shall set forth the reasons for its issuance...." Where such an order is issued on the basis of the defendant's consent to an injunction, however, this requirement could be satisfied by a simple statement of this fact (i.e., by the statement that the order is being issued because the defendant has consented to the injunction). Hence, this rule is of little help.

Similarly, Federal Rule of Civil Procedure 52(a) requires in relevant part that "[i]n all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon...." At least one court has held that this requirement applies to actions seeking a permanent injunction. *See*

---

public as to the origin or sponsorship of its services or products.
Furthermore, the Court ordered that ELA "shall disclaim any right or entitlement to the URL NYSSCPA.COM, and shall promptly take any and all actions reasonably necessary to assign or convey, at its own expense, any and all interest it may have in such URL to plaintiff NYSSCPA or any designee of the plaintiff...."

**2.** "Eric Louis ... has decided (without admitting that it intentionally or otherwise engaged in any wrongdoing or bad faith) that it would consent to entry of an order...." (Finkel-

stein Aff. in Response to Motion for Injunction ¶ 2.) "Eric Louis makes no admission whatsoever that it engaged in any wrongdoing or acted in bad faith." (*Id.* ¶ 5.)

**3.** "The Plaintiff's court papers do not establish any likelihood of confusion *or* evidence of dilution." (Finkelstein Aff. in Opposition to Motion for Award of Damages and Attorneys' Fees ¶ 2(d).) "[T]here is no evidence that the defendant infringed any copyright of the plaintiff merely by enabling the viewer to bring up the plaintiff's web page in its web page." (Mem. Opp. at 3 n.1.)

*United States v. Rohm & Haas Co.,* 500 F.2d 167, 177 (5th Cir.1974) (emphasis added) (citations omitted) ("In cases tried without a jury, Rule 52(a) mandates findings of fact and conclusions of law sufficiently detailed and exact to indicate the factual basis *for the District Court's ultimate conclusion.* Although the rule refers only to the *granting or refusing* of interlocutory injunctions, the language 'all actions tried upon the facts without a jury' encompasses suits in which permanent injunctions are issued."). As the language of both the rule and that opinion indicate, however, the rule appears to be predicated on the "trying" of an issue and subsequent *deciding* thereof by a court. In approving the agreement embodied in the permanent injunction Order, the Court did not decide any issue in dispute between the parties. Hence, Rule 52(a) provides no more guidance than does Rule 65(d).

Third, Federal Rule of Civil Procedure 68 creates a mechanism by which defendants "may serve upon the adverse party an offer to allow judgment to be taken against" them. As this mechanism is closely analogous to the more informal procedure of consenting to entry of a permanent injunction, the case law interpreting Rule 68 may shed some light on the issue under consideration here. Courts have held that Rule 68 offers can be made in cases seeking equitable relief, *see* 12 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Fed. Prac. & Proc. § 3001.1, at 79 (1997), and that defendants "can ... disclaim liability while offering that judgment be entered as so specified," *id.* § 3002, at 93. "[S]uch a [disclaimer] provision may present nice questions if the offer provides for injunctive relief that is authorized only after a finding of a violation." *Id.* It is a very similar "nice question" with which we find ourselves presented here.

■ We turn, next, to four rules established in the case law that have some bearing on the issue. First, the standard for granting a permanent injunction is actual success on the merits. *See, e.g., Hard*

*Rock Cafe Int'l (USA) Inc. v. Morton,* 1999 WL 701388, at *4 (S.D.N.Y.1999). Hence, it could be argued that, having ordered a permanent injunction, this Court determined, *ipso facto,* that Plaintiff prevailed on its underlying trademark and copyright claims. Like Rule 52(a), however, this rule would seem to apply only when a court must *decide* whether a permanent injunction should issue. In endorsing the agreement embodied in the permanent injunction Order, the Court did not necessarily determine that Plaintiff had actually succeeded on the merits of its infringement claims. Hence, this rule is inconclusive.

Second, in *SEC v. Bausch & Lomb, Inc.,* 82 F.R.D. 50, 51 (S.D.N.Y.1979), the defendants, in consenting to a permanent injunction "neither admitted nor denied the allegations of the complaint [but] .... specifically waive[d] their right to require the Court to make findings of fact and conclusions of law." This case thus supports the view that liability should not be inferred from a defendant's consent to a permanent injunction.

Third, support for this view is likewise provided by a Second Circuit opinion involving claims similar to those brought by Plaintiff here, albeit a somewhat different procedural history. In *Goodheart Clothing Co., Inc. v. Laura Goodman Enters., Inc.,* 962 F.2d 268 (2d Cir.1992), a hearing was held on, and the court granted, plaintiff's motion for a preliminary injunction. Defendants then tendered a Rule 68 offer of judgment that provided for a permanent injunction, and the court accordingly issued an order of permanent injunction. Plaintiff then filed an application for costs and attorney fees under § 35(a) of the Lanham Act. The issue on appeal was whether the district court's finding (in its opinion granting the preliminary injunction) that defendant had acted in bad faith was law of the case for the purposes of the application for attorney fees. *See id.* at 272–74. The Court of Appeals ruled that, despite language in the district court's or-

der purporting to incorporate its opinion on the motion for a preliminary injunction, the issue of defendant's bad faith, for purposes of the application for attorney fees, could not be taken as settled by the court's finding of bad faith in its preliminary injunction opinion. *See id.* at 274 ("It would ... be anomalous at least in most cases ... to regard the initial ruling as foreclosing the subsequent, more thorough consideration of the merits that the preliminary injunction expressly envisions."). Although this holding is thus not directly on point, it is consistent with the proposition that, unless a defendant explicitly concedes an issue in the consent to a permanent injunction, a court cannot infer the establishment of this issue from the defendant's consent.

In contrast, two Court of Appeals decisions provide some support for the view that liability *can* be inferred from consent to a permanent injunction. In a case from the closely related area of patent law, the Second Circuit held that "in a decree, at least in one entered by consent, either an adjudication of infringement, or a grant of some relief from which infringement may be inferred, is essential before any effect of res judicata can be given to it on the issue of [patent] validity." *Addressograph–Multigraph Corp. v. Cooper,* 156 F.2d 483, 485 (2d Cir.1946). Applying this rule in a patent infringement case, the Eighth Circuit held that "[a]lthough the consent decree, under consideration here, does not explicitly adjudge that the defendants had infringed [plaintiff's patented] device, that finding is implicit in the decree. Infringement was the key issue in the original suit; injunctive relief was sought, and pursuant to consent of the defendants, they were 'permanently enjoined from infringing [plaintiff's] patents....' Surely the injunctive relief granted is 'relief from which infringement may be inferred.'" *Crane Boom Life Guard Co. v. Saf–T–Boom Corp.,* 362 F.2d 317, 321–22 (8th Cir.1966). It should be noted, however, that there is no indication in *Crane Boom* that the consent decree included disclaimers of liability.

Finally, we consider an argument based on § 35(a) of the Lanham Act, i.e., the statutory basis for an award of attorney fees and damages for trademark infringement and/or dilution. Like many other fee-shifting statutes, § 35(a) specifies that attorney fees are recoverable only by the prevailing party to a trademark suit. As such, a considerable jurisprudence has developed on the issue of when a party is to be deemed "prevailing" for the purpose of shifting fees. In suits brought under the civil rights statutes, it is well-established law that "when relief has been obtained by settlement or consent decree ... without a judicial resolution of the controversy, the plaintiff is the prevailing party for fee award purposes." 1 Albe Conte, Attorney Fee Awards § 3.07, at 145 (2d ed.1993) (*citing Hanrahan v. Hampton,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980); *Maher v. Gagne,* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980)); *see also Crowder v. Hous. Auth. of Atlanta,* 908 F.2d 843, 849 (11th Cir.1990) (holding that party who had secured injunctive relief by means of adverse party's consent to permanent injunction was prevailing party for purposes of attorney fee award under 42 U.S.C. § 1988). Although it appears that this rule has not been extended to applications for fees under § 35(a), it could be argued that this extension should now be made.

This argument should be resisted, however, because there is a crucial difference between the civil rights fee shifting statute, 42 U.S.C. § 1988, and § 35(a). Like the award of costs under § 35(a), the award of attorney fees under § 1988 depends *solely* on a party's attaining "prevailing" status. *See Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (internal citations and quotations omitted) (holding that "a prevailing party should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust"). An

award of attorney fees under § 35(a), in contrast, requires, in addition, a judicial determination that the party's infringing conduct was "exceptionally" bad. *See Bowmar Instrument Corp. v. Continental Microsystems, Inc.*, 497 F.Supp. 947, 961 (S.D.N.Y.1980) ("Costs, in contrast [to attorney fees], should be awarded with respect to the entire action because [§ 35(a) of] the Lanham Act does not limit such an award to 'exceptional cases' but makes it one of the routine elements of a prevailing plaintiff's recovery."). Because of this additional requirement, the mere determination that a party has prevailed in a trademark suit does not entitle the party to an award of attorney fees.

In view of this important difference between § 35(a) and § 1988, the § 1988 rule (concerning consent to permanent injunctions) could, at most, be extended *analogically* to § 35(a); i.e., it could be taken to suggest the rule that, under § 35(a), consent to a permanent injunction suffices to establish that the case is exceptional. The adoption of such a rule, however, would be misguided for at least two reasons. First, it would be inconsistent with established judicial interpretation of what constitutes an "exceptional case" under § 35(a). As is discussed more fully in Section I below, the Second Circuit has held that an exceptional case of trademark infringement or dilution is one involving willfulness, fraud, or bad faith. While it makes sense to hold that obtaining a permanent objection via the defendant's consent counts as prevailing in an action for injunctive relief, it makes far less sense to say that obtaining a permanent objection via the defendant's consent amounts to showing that the defendant infringed a trademark willfully, fraudulently, or in bad faith. This is because a finding of willful infringement requires a close examination of the defendant's conduct and state of mind–an examination,

moreover, that must be carried out for each alleged trademark violation. If a plaintiff alleges both trademark infringement and trademark dilution, for example, it is possible that the defendant willfully infringed but did not willfully dilute.

Second, such a rule would have the perverse effect of discouraging settlement. Defendants occasionally consent to injunctions because they simply lack the funds required for litigation. In fact, Defendant ELA suggests that this was its reason for consenting to the Court's Order of permanent injunction. (*See* Elias Aff. ¶ 14 ("The plaintiff knew that we were a tiny company, and thus must have known that we could not afford to litigate.").) More important, defendants frequently consent to injunctions because they believe they are likely to lose on only one or some of the plaintiff's claims. In the present case, for instance, it is especially implausible to contend that Defendant, in consenting to the permanent injunction, conceded liability on Plaintiff's copyright claim based on Defendant's "framing" of Plaintiff's web site within Defendant's web site. As Defendant (correctly) points out, no court to date has held that framing constitutes copyright infringement. (*See* Mem. Opp. at 3.) Therefore, the proposed rule would create a disincentive to consent; defendants who believed that they were liable on only some of the plaintiff's claims would be less likely to consent to an injunction if their doing so was necessarily construed as an admission of liability on *all* of the plaintiff's claims. In other words, the argument has the effect of vitiating the practice of including disclaimers of liability in consent agreements. Yet many consent agreements would never be signed without the inclusion of such disclaimers.[4]

■ Taking the foregoing considerations into account, we found that, on balance, the better view is that, for the purposes of deciding an application for

---

4. It is presumably for this very reason that courts have held that disclaimers may be in-

cluded in Rule 68 offers of judgement.

attorney fees, a defendant's liability on the underlying trademark or copyright claims cannot be simply inferred from the defendant's consent to a permanent injunction. In light of this, we concluded that we are obliged to make findings of fact and draw conclusions of law concerning Plaintiff's substantive claims *to the extent necessary for deciding Plaintiff's application for damages and attorney fees*. Upon reaching this conclusion, we advised the parties of our belief that Plaintiff's fee application required the Court to make findings of fact and reach conclusions of law on the merits of Plaintiff's claims. We asked the parties whether, in light of this, there was any desire to submit any additional documentation or present any live testimony. Plaintiff submitted an additional brief affirmation, and Defendant submitted a brief letter. Neither party, however, expressed a desire to present live testimony.

## Findings of Fact

Founded in 1897, the Society is a not-for-profit corporation organized and existing under the laws of New York. It has eleven local chapters–each representing a portion of New York State–and a total membership in excess of 30,000. The Society seeks to cultivate, promote, and disseminate information concerning certified public accountants, establish and maintain high standards of integrity, honor, and character among certified public accountants, furnish information regarding accountancy and the practice and methods thereof to its members and the general public, and protect the interests of its members and the general public with respect to the practice of accountancy. (*See* Mem. Fees, at 2.)

Since 1984, the Society has been using the common-law servicemark "NYSSCPA" to identify itself in connection with services and goods it offers to its professional membership and to the public at large. The Society purports to be the exclusive owner of all rights, title, and interest in the NYSSCPA mark. As such, the Society does not authorize or permit any individual or corporation to use the NYSSCPA mark without written permission or authorization. The Society has numerous "affinity" agreements with various commercial entities that permit the use of the Society's name and the NYSSCPA mark to promote certain goods and services marketed by such entities to the Society's members, e.g., credit cards, courier services, and telephone services. Revenue generated from these agreements are applied to the funding of the Society's operations. (*See id.* at 3.)

The Society publishes and distributes in interstate commerce two monthly publications, The CPA Journal and The Trusted Professional, and each of the Society's eleven chapters publishes its own periodic newsletter. (*See id.*) Recent annual expenses for the Society's publications have been in excess of $1.5 million. (*See* Comp. ¶ 10.) Since 1995, the Society has distributed to members and non-members various goods with the NYSSCPA mark imprinted thereon, e.g., hats, scarves, pins, travel mugs, cups, CD cases, travel bags, sport shirts, sport visors, and paper weights. Similarly, the Society uses the NYSSCPA mark on its promotional material, e.g., business cards, mailing envelops, press releases, and letterhead. (*See id.* ¶ 11.) Furthermore, the Society receives a good deal of unsolicited media coverage, most of which refers to the society as the NYSSCPA. (*See* Mem. TRO, at 12.)

On November 18, 1994, the Society registered the domain name "nysscpa.org.", and, since March 1997, the Society has operated a web site at this internet address. The web site provides information about the Society, certified public accounting, and accounting in general, including news stories and press releases concerning topics and activities that are of interest to the Society's members. The web site also provides information about Society publications, member services, conferences and

social events, the New York State CPA licensing requirements, and CPA societies in other states. Finally, the web site includes a classifieds page, a member directory, and tax forms. (*See id.* at 4.)

Incorporated in 1996, ELA is a small firm "specializ[ing] in Permanent and *Temporary* placement of financial, accounting, brokerage and support professionals at all levels throughout the tri-state [New York, New Jersey, Connecticut] area." (Elias Aff. Ex. B.) As of April 1999, ELA had two employees and assets of approximately $23,000. (*See id.* ¶ 1, Ex. A.) On December 9, 1998, ELA registered the domain name "eric-louis.com". On January 8, 1999, ELA registered the domain name "ericlouis.com". On January 9, 1999, ELA registered the domain name "nysscpa.com". (*See* Comp. ¶¶ 31, 36.) Shortly thereafter, ELA began operating identical web sites at each of these three internet addresses. (*See* Elias Aff. ¶ 5.) The home page of each site clearly indicated that the site belonged to ELA, stated that the "site is not affiliated with" the Society, and provided a hyperlink to the Society's web site at "www.nysscpa.org". (*Id.* Ex. B.) Upon clicking on this hyperlink, the Society's web site would appear "framed" within ELA's site. During such framing, the viewer screen showed (1) a line across the top of the page with the header "Eric–Louis Associates, Inc."; (2) a column along the left hand side of the screen containing user selectable options pertinent solely to Defendant's web site, and an Amazon.com advertisement; and (3) a box taking up the remaining two-thirds of the screen containing the home page of the Society's web site. (*See* Mem. TRO, ¶ 40; Montague Decl. Exs. M–R.) Furthermore, each of the three sites used "NYSSCPA" as a "metatag" within its HTML code, such that an internet search for NYSSCPA would lead to each of the three sites. (*See* Comp. ¶ 45; Mem. Fees, at 4.)

Upon learning of Defendant's use of its NYSSCPA mark, the Society, in a letter dated March 25, 1999, demanded that ELA cease and desist its continued use of the "nysscpa.com" domain name and its hyperlinking to and framing of the Society's web site. (*See* Comp. ¶ 50; Grumet Decl. Ex. L.) In a letter dated March 26, 1999, ELA responded that it would agree to the Society's demands on the condition that the Society paid it $20,000 or provided it, free of charge, an exhibitor's booth at the annual NYSSCPA conference for the next five years. (*See* Grumet Decl. Ex. M.) In a memorandum dated April 6, 1999, ELA informed the Society that two local CPA firms had expressed interest in purchasing the "nysscpa.com" domain name. (*See id.* Ex. N.) In a letter dated April 6, 1999, the Society rejected ELA's March 26 offer, and reiterated its cease and desist demand. (*See id.* Ex. O.) The Society then began preparing a legal action against Defendant, and, in view of Defendant's failure to cease and desist, commenced this action on April 27, 1999.

## Conclusions of Law

### I. False Designation of Origin

■ Section 43(a) of the Lanham Act creates a cause of action for "false designation of origin" in relation to goods and services. 15 U.S.C. § 1125(a). Because Plaintiff's mark is unregistered, Plaintiff, to establish false designation of origin, must show that (1) the mark has acquired secondary meaning and (2) there is a likelihood of confusion as to the goods or services in question. *See Centaur Communications Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1221 (2d Cir.1987).

#### A. Secondary Meaning

■ A mark has acquired secondary meaning if "the primary significance of the term in the minds of the consuming public is not the product but the producer." *Id.* (citations and internal quotations omitted). Second Circuit courts utilize the following six factors to determine whether a mark has acquired secondary meaning: (1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unso-

licited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use. *See id.* at 1222. No single factor is determinative and every element need not be proved. *See id.* The most important factor, however, is (5). *See 20th Century Wear, Inc. v. Sanmark–Stardust, Inc.*, 815 F.2d 8, 10 (2d Cir.1987) (holding that "[a] finding that [a defendant] had intentionally copied [the plaintiff's] mark could ... be persuasive, if not conclusive, evidence of consumer recognition and goodwill"). Defendant's use of the "nysscpa.com" domain name and the "NYSSCPA" meta-tag is clear evidence of an attempt to plagiarize the Society's mark. According to Defendant's web site, Defendant's partners are members of the Society, and thus there is little chance that they were unaware that the Society uses the NYSSCPA mark to identify itself. (*See* Elias Aff. Ex. B.) Furthermore, the name "nysscpa" neither appears to be related to any characteristic of Defendant's business, nor has Defendant asserted any such relation. Therefore, it is highly likely that Defendant adopted the "nysscpa.com" domain name and employed the "NYSSCPA" meta-tag with a clear intent to copy the Society's NYSSCPA mark.

Four of the remaining five factors also support a finding of secondary meaning. As to factor (1), Plaintiff has presented uncontroverted evidence that the Society spends in excess of $1.5 million each year on advertising and promotion, much of which involves the NYSSCPA mark. (*See* Grumet Decl. ¶ 9.) Similarly, as to factor (3), Plaintiff has submitted a number of examples of unsolicited media coverage of the Society, each of which involves usage of the NYSSCPA mark. Turning to factor (4), the fact that the Society has in excess of 30,000 members is strong evidence of the Society's sales success. (*See id.* ¶ 3.)

The sole factor weighing in Defendant's favor is factor (2), as Plaintiff has failed to provide evidence of consumer studies linking the mark to its source.

In view of the foregoing analysis, the Court finds that the NYSSCPA mark has acquired secondary meaning.

## B. Likelihood of Confusion

■ In deciding whether a likelihood of consumer confusion exists, Second Circuit courts employ the eight factor test established by Judge Friendly in *Polaroid Corporation v. Polarad Electronics Corporation*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961):(1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the competitive proximity of the products or services; (4) the likelihood that the plaintiff will "bridge the gap" between the two markets; (5) the existence of actual confusion; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the purchasers.

■ Furthermore, if the evidence shows that the defendant intentionally copied the plaintiff's mark, likelihood of confusion will be presumed as a matter of law. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir.1987).

Plaintiff alleges that each of three distinct aspects of Defendant's conduct causes a likelihood of confusion: (A) Defendant's use of the "nysscpa.com" domain name; (B) Defendant's use of Plaintiff's NYSSCPA mark as a meta-tag; and (C) Defendant's "framing" of the contents of Plaintiff's web site within its own web site. Because (A) and (B) are functionally quite similar, we first consider them together. (C) is discussed separately thereafter.

### 1. The "nysscpa.com" Domain Name and the "NYSSCPA" Meta–Tag

■ Having found, in Section I.A above, that Defendant intentionally copied Plaintiff's NYSSCPA mark, we can presume as a matter of law that the likelihood of confusion requirement is satisfied in this case.

Furthermore, an analysis of the facts of this case in terms of the eight *Polaroid* factors confirms this conclusion. Factor (1) clearly weighs in Plaintiff's favor. It was precisely the recognizability of the Society's mark that led Defendant to adopt the "nysscpa.com" domain name and the "NYSSCPA" meta-tag. Similarly, the facts that this meta-tag is identical to the Society's mark, and that this domain name is nearly identical to the Society's mark, provides–pursuant to factor (2)–strong support for the conclusion that Defendant's use of these two names was likely to confuse consumers. Many persons searching for the Society's web site, but unaware of its precise address, would either assume that it was located at nysscpa.com or attempt to access it by typing the Society's NYSSCPA mark into a search engine.

Turning to the third factor, competitive proximity, the parties' respective web sites are both located on the World Wide Web, and the "sites compete for the same audience–namely, Internet users who are searching for a web site that uses plaintiff's mark as its address." *Planned Parenthood v. Bucci,* 1997 WL 133313, at *8 (S.D.N.Y.1997). On the other hand, despite the fact that Plaintiff's site includes a classified advertisement section, Plaintiff and Defendant are, for the most part, not in direct competition with each other. Those persons seeking Plaintiff's site with the intention of viewing the classified job advertisements–and who are diverted to Defendant's site by means of the "nysscpa.com" domain name or the "NYSSCPA" meta–tag–may, indeed, end up using Defendant's services rather than Plaintiff's classifieds. But most persons so diverted will merely be confused, even if only momentarily, and then resume trying to find the Society's actual site. As is explained below, however, this momentary confusion suffices to establish a likelihood of confusion. As such, even if this factor were placed on Defendant's side of the scale, it would be of little moment.

"The fourth factor looks to whether the senior user of the mark is likely to enter the market in which the junior user is operating, that is, bridge the gap." *Centaur Communications,* 830 F.2d at 1227. In the sense that the two sites are competing for the same users, viz., those looking for a web site that uses Plaintiff's NYSSCPA mark as its address, there is no gap to bridge. More broadly, however, it appears unlikely that the Society intends to enter the financial professional placement business. This factor, therefore, can have little impact on our determination.

Because Plaintiff presents only one instance of actual confusion, (*see* Mem. TRO, at 15), this factor provides little support for a finding of a likelihood of confusion.

The sixth factor concerns whether the defendant adopted the senior user's mark in good faith. Because this same question is part of the inquiry as to whether Plaintiff is entitled to an award of attorney fees, and carries more importance in that inquiry than in the present determination of likelihood of confusion, we defer discussion of it to Section V below on attorney fees. That discussion concludes that there is ample evidence of bad faith in this case.

Turning to the seventh factor, the quality of the junior user's product, Plaintiff suggests that the quality of the services offered by Defendant is "almost inherent[ly]" inferior to Plaintiff's services because the Society is "a not-for-profit State society seeking to benefit the CPA profession," whereas ELA is a "purely commercial .... job placement company, often referred to as 'head hunters' [sic]." (Mem. TRO, at 16.) The Court finds that the degree of inferiority attributable to this difference is *de minimis,* and thus that this factor contributes little to a finding of likelihood of confusion.

Coming finally to the eighth factor, the sophistication of the consumers of the parties' respective services, a finding that the consumers are sophisticated "usually militates against a finding of a likelihood of confusion." *Centaur Communications,*

830 F.2d at 1228. This is not an important factor in this case, however, because the particular type of confusion caused by Defendant's use of the "nysscpa.com" domain name and the "NYSSCPA" meta-tag afflicts sophisticated visitors no less than it does unsophisticated visitors. *See Planned Parenthood*, 1997 WL 133313, at \*9. This type of confusion has been dubbed "initial interest confusion" by the Ninth Circuit, and, because it does not fit neatly within any of the eight *Polaroid* factors, we consider it separately below in connection with Defendant's "disclaimer" defense.

In sum, an analysis of Defendant's conduct in terms of the eight *Polaroid* factors supports a finding of a likelihood of confusion.

Defendant disputes this conclusion, arguing that its use of the "nysscpa.com" domain name and the "NYSSCPA" meta-tag cannot possibly confuse visitors of its web site because its home page (a) clearly identifies the site as that of ELA in large, bold lettering, (Finkelstein Aff. ¶ 2(b)), and (b) includes the following disclaimer: "NOTE: Though our partners are members of the New York Society of CPA's this site is not affiliated with them. Please direct all queries about them to www.nysscpa.org," (*id.;* Elias Aff. Ex. B.) The problem with this argument is that it ignores the *initial* confusion caused by Defendant's use of these two devices. Person's using them are expecting to arrive at the Society's web site. When they arrive instead at Defendant's web site, they cannot help being confused–even if only momentarily. In recognition of this very point, Judge Wood held that a "defendant's appropriation of [a] plaintiff's mark as a domain name and home page address

cannot adequately be remedied by a disclaimer. [A][d]efendant's domain name and home page address are external labels that, on their face, cause confusion among Internet users and may cause Internet users who seek plaintiff's web site to expend time and energy accessing defendant's web site." *Planned Parenthood*, 1997 WL 133313, at \*12 (granting motion for preliminary injunction).

More recently, the Ninth Circuit, in *Brookfield Communications, Inc. v. West Coast Entertainment Corporation*, 174 F.3d 1036 (9th Cir.1999), dubbed this confusion "initial interest confusion," and likewise held that a finding of it suffices to establish a likelihood of confusion for purposes of granting a preliminary injunction. In *Brookfield*, the defendant used meta-tags (viz., "moviebuff.com" and "MovieBuff") based on the plaintiff's "MovieBuff" mark. The court held that "[a]lthough there is no source confusion in the sense that consumers know they are patronizing [the defendant] rather than [the plaintiff], there is nevertheless initial interest confusion in the sense that, by using 'moviebuff.com' or 'MovieBuff' to divert people looking for 'MovieBuff' to its web site, [defendant] improperly benefits from the goodwill that [plaintiff] developed in its mark." *Id.* at 1062.[5]

In accord with these opinions, we find that Defendant's use of the "nysscpa.com" domain name and the "NYSSCPA" meta-tag caused a likelihood of confusion because it created initial interest confusion. Having also found that Plaintiff's NYSSCPA mark has acquired secondary meaning, the Court holds that these actions constitute false designation of origin under § 43(a) of the Lanham Act.[6]

---

5. Although the Second Circuit has not explicitly adopted this rule, it should be noted that the *Brookfield* court borrowed the concept of initial interest confusion from a Second Circuit case (not involving domain names and meta-tags) that held that such " 'initial confusion works a sufficient trademark injury.' " *Id.* at 1063 (*quoting Mobil Oil*, 818 F.2d at 260).

6. Several previous cases have found infringement where the junior user's conduct consisted of using a domain name formed by adding ".com" to the senior user's mark. *See Washington Speakers Bureau, Inc. v. Leading Authorities, Inc.*, 33 F.Supp.2d 488 (E.D.Va. 1999); *America Online, Inc. v. LCGM, Inc.*, 46 F.Supp.2d 444 (E.D.Va.1998); *Cardservice Int'l, Inc. v. McGee;* 950 F.Supp. 737

## 2. Framing

Plaintiff's claim that Defendant's framing of Plaintiff's web site within its own web site constitutes false designation of origin presents an issue of first impression. The Court is ill-situated to decide such an issue, however, given the peculiar procedural history of this case. Having decided simply to consent to entry of a permanent injunction, Defendant never briefed the issue.[7] However, we need not address this issue, as its resolution is not necessary for deciding Plaintiff's application for attorney fees. Having already decided that Defendant's use of the "nysscpa.com" domain name and the "NYSSCPA" meta-tag constitute false designation of origin, the predicate for a decision on Plaintiff's application has already been established.

## II. Dilution Under § 43(c) of the Lanham Act

Section 43(c) of the Lanham Act provides in relevant part that "[t]he owner of a famous mark shall be entitled ... to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark...." 15 U.S.C. § 1125(c)(1). There are thus "five necessary elements to a claim of dilution [under § 43(c) ]: (1) the senior mark must be famous; . (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark." *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 214 (2nd Cir.1999). In determining whether a mark is distinctive and famous, a court may consider the following factors:

(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(1). There is clearly a certain degree of overlap among these eight factors and the six factors that are to guide determinations of whether a mark has acquired secondary meaning. For instance, factors (B) and (D) here parallel the sixth secondary meaning factor, viz., the length and exclusivity of the plaintiff's use of the mark. Similarly, factor (C) here and the first secondary meaning factor both concern the extent of advertising in regard to the mark. More generally, a determination whether a mark has acquired secondary meaning is tantamount to a determination of the mark's distinctiveness–factor (A) here. With these areas of overlap in mind, we turn to a consideration of the facts of this case in light of the eight statutory factors.

(E.D.Va.1997); *Lozano Enters. v. La Opinion Publ'g Co.*, 44 U.S.P.Q.2d 1764, 1997 WL 745036 (C.D.Cal.1997).

7. *Cf. Panavision Int'l, L.P. v. Toeppen*, 945 F.Supp. 1296, 1306 (C.D.Cal.1996) (declining to award attorney fees in a domain name

trademark case because "[t]he particular trademark issues dealt with ... are all issues of first impression .... [and because of] the overall lack of legal precedent regarding issues arising from the intersection of trademark law and the Internet").

As was the case with Plaintiff's allegation of false designation of origin, Plaintiff alleges that dilution is caused by (A) Defendant's use of the "nysscpa.com" domain name; (B) Defendant's use of the "NYSSCPA" meta-tag; and (C) Defendant's framing of Plaintiff's web site. Given the functional similarity between (A) and (B), we first consider them together, and then advance to a separate analysis of (C).

### A. The "nysscpa.com" Domain Name and the "NYSSCPA" Meta–Tag

▬ We begin with the question of whether the Society's NYSSCPA mark is famous. As noted in Section I.A above, since 1984, the Society has used the mark in its extensive advertising and promotional activities, and much of the free publicity it has received includes reference to the mark. Furthermore, the Society has more than 30,000 members, most of whom live in or near New York State. The Court finds, therefore, that in the accounting channel of trade in the New York trading area, there is a high degree of recognition of the Society's mark, and thus that the mark is famous in this particular trade and geographical area.

Turning to the question of whether the mark is distinctive in addition to being famous, our earlier determination that the mark has acquired secondary meaning goes a long way toward establishing that the mark is distinctive. In further support of this conclusion, Plaintiff has presented uncontroverted evidence that there is very little use of the same or similar marks by third parties (factor (G)). Specifically, a search of federal and state trademark registries yielded only one use of a similar mark (viz., "NYSCPA.COM") by a third party. (*See* Montague Decl. ¶ 7, Ex. F.) The Court finds, therefore, that the Society's mark is distinctive as well as famous.

As for the third element, whether the junior use is a commercial use in commerce, there can be little doubt that Defendant's use of Plaintiff's mark was for commercial purposes. Defendant employed the "nysscpa.com" domain name and the "NYSSCPA" meta-tag for the purpose of attracting potential clients to its web site. Furthermore, Defendant attempted to sell the "nysscpa.com" domain name to Plaintiff. *See Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1325 (9th Cir.1998) (holding that registering and then attempting to sell a domain name based on senior user's mark is commercial use of that mark); *Toys R Us Inc. v. Abir,* 45 U.S.P.Q.2d 1944, 1948, 1997 WL 857229 (S.D.N.Y.1997) (same).

The fourth element is likewise satisfied. Whereas Plaintiff began use of the NYSSCPA mark in 1984, Defendant did not begin use of the "nysscpa.com" domain name and the "NYSSCPA" meta-tag until January 1999.

We come, finally, to the fifth and most important element, whether Defendant's use of the mark caused dilution of its distinctive quality. The FTDA defines "dilution" as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or deception." 15 U.S.C. § 1127. A mark can be diluted in two ways: blurring and tarnishment. *See Clinique Labs., Inc. v. Dep Corp.,* 945 F.Supp. 547, 561 (S.D.N.Y.1996) (*citing* H.R.Rep. No. 374, 104th Cong., 1st Sess. 3, reprinted in 1995 U.S.C.C.A.N. 1029, 1030).

### 1. Blurring

Blurring occurs "where the defendant uses . . . the plaintiff's trademark to identify the defendant's goods or services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's services." *The Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 966 (2d Cir.1996) (citation and internal quotation omitted).

Furthermore, the Second Circuit has recently identified ten nonexclusive factors

that may be taken into account in determining whether dilution–particularly of the blurring type–has occurred: (1) distinctiveness of the senior mark; (2) similarity of the marks; (3) proximity of the products and likelihood of bridging the gap; (4) interrelationship among factors (1)-(3); (5) shared consumers and geographic limitations; (6) sophistication of consumers; (7) actual confusion; (8) adjectival or referential quality of the junior use; (9) harm to the junior user and delay by the senior user; and (10) effect of a senior user's prior laxity in protecting the mark. *See Nabisco*, 191 F.3d at 217–221. [8]

In light of our earlier determinations (a) that the Society's NYSSCPA mark is distinctive, (b) that the "NYSSCPA" meta-tag is identical the Society's NYSSCPA mark, and the "nysscpa.com" domain name is nearly identical to the Society's NYSSCPA mark, and (c) that the parties' respective web sites are in close proximity, we have already gone some way toward establishing that Defendant's use of Plaintiff's mark constitutes blurring thereof. A consideration of factor (4) further supports this conclusion. Because (a) the Society's mark is highly distinctive, (b) the Society's mark and Defendant's "nysscpa.com" domain name and "NYSSCPA" meta-tag are identical or nearly so, and (c) the parties' respective web sites are in close proximity, the combination of these three factors is more indicative of dilution than is their mere summation.

Turning to factor (5), many of the visitors of Defendant's web site are persons interested in visiting Plaintiff's web site. Similarly, many of the potential consumers of Defendant's services are CPAs, the very class of persons who are the main consumers of Plaintiff's services. Furthermore, Defendant's web site states that ELA specializes in the placement of financial professionals "through out [sic] the tri-state area." (Elias Aff. Ex. B.) The tri-state area (New York City and the portions of New York, New Jersey, and Connecticut near New York City) roughly coincides with a portion of the geographic area served by the Society.

Factor (8) also counts in Plaintiff's favor. The domain name "nysscpa.com" does not describe any characteristic of Defendant's area of commerce, viz., recruitment and placement of financial professionals. Similarly, factors (9) and (10) count in Plaintiff's favor because, although Plaintiff does not indicate the precise date on which it learned of Defendant's allegedly infringing use of its NYSSCPA mark, Plaintiff's initial cease and desist demand was made less than four months after Defendant had begun using Plaintiff's mark.

The only factor that weighs in Defendant's favor is (7), because, as noted above, Plaintiff has presented virtually no evidence of actual confusion.

This leaves factor (8), the sophistication of the consumers likely to visit Defendant's web site as a result of Defendant's use of Plaintiff's NYSSCPA mark. This factor is largely irrelevant because, as noted above, the only serious type of confusion wrought by this use was "initial interest" confusion, and sophisticated CPAs were no less subject to it than were unsophisticated laypersons.

The question thus becomes whether initial interest confusion–which the courts have just begun to recognize as relevant to

---

**8.** As factors (2), (3), and (6) indicate, the *Nabisco* court noted that there is a large degree of overlap between a determination of dilution under § 43(c) and a determination of infringement under § 43(a). *See id.* at *8 ("Consumer confusion–the nub of an action for infringement–is, of course, unnecessary to show the actionable dilution of a famous mark. It does not follow, however, that dilution cannot be found in circumstances that would also support an action for infringement. Consumer confusion would undoubtedly dilute the distinctive selling power of a trademark."); *see also Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F.Supp. 733, 749 (S.D.N.Y.1997) (noting that "[t]he determination of whether a mark is famous and distinctive under Section 43(c) is similar to the analysis for strength of the mark for trademark infringement purposes").

a determination of likelihood of confusion under § 1125(a)–is also relevant to a determination of dilution under § 1125(c). *Nabisco's* general holding that evidence of confusion is highly relevant to a determination of dilution strongly suggests an affirmative answer to this question. Hence, the Court finds that the initial interest confusion caused by Defendant's use of Plaintiff's mark is a further factor in favor of a finding that this use constitutes blurring of Plaintiff's mark.

In light of the foregoing analysis, the Court finds that Defendant's use of Plaintiff's NYSSCPA mark constitutes blurring of this mark, and thus dilution of this mark under § 1125(c).[9]

### 2. Tarnishment

The Second Circuit has held that " '[t]arnishment' generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product. In such situations, the trademark's reputation and commercial value might be diminished because the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods, or because the defendant's use reduces the trademark's reputation and standing in the eyes of consumers as a wholesome identifier of the owner's products or services." *Deere & Co. v. MTD Prods., Inc.,* 41 F.3d 39, 43 (2d Cir.1994) (citations omitted). Plaintiff alleges that Defendant's use of its NYSSCPA mark constitutes tarnishment thereof, because the Society's spotless image as a not-for-profit society in the service of the accounting profession would be tarnished if it were thought that the Society had affiliated itself with a for-profit placement firm. This is because such "head hunter" firms are regarded by many as "truly self-

serving and unscrupulous entities." (Mem. TRO, at 24.)

The Court doubts that placement firms in general have as bad a reputation as Plaintiff suggests. We find persuasive, however, Plaintiff's contention that a suggestion of affiliation between the Society and a for-profit commercial entity engaged in placing accountants would tarnish the Society's mark to some degree.

### B. Framing

The reasoning undergirding our decision not to consider Plaintiff's infringement claim based on framing, *see supra* Section I.B.2, applies, *mutatis mutandis,* to Plaintiff's dilution claim based on framing. As such, we likewise need not consider this latter claim.

### III. Dilution Under New York General Business Law Section 360–1

Because Plaintiff is seeking damages and/or attorney fees under § 35(a) of the Lanham Act, and because § 35(a) provides for such relief only upon violation of federal trademark law, we need not consider whether Defendant's use of Plaintiff's mark constitutes dilution under New York law. This said, such a consideration would be purely mechanical in any case. "Because the language of Section 43(c) of the Lanham Act mirrors the traditional New York dilution analysis, courts apply the same analysis to dilution claims under the Lanham Act and New York state law." *Hard Rock Cafe Int'l (USA) Inc. v. Morton,* 1999 WL 717995,*32 n.29 (S.D.N.Y.) (citations and internal quotations omitted). Given that Defendant's use of Plaintiff's mark constitutes dilution under the Lanham Act, it follows that this use likewise constitutes dilution under New York General Business Law § 360–1.

---

9. Several cases have found dilution where the junior user's conduct consisted of using a domain name formed by adding ".com" to the senior user's mark. *See Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316 (9th Cir.1998); *America Online, Inc. v. LCGM, Inc.,* 46 F.Supp.2d 444 (E.D.Va.1998); *Toys R Us v. Abir,* 45 U.S.P.Q.2d 1944, 1997 WL 857229 (S.D.N.Y.1997); *Lozano Enters. v. La Opinion Publ'g Co.,* 44 U.S.P.Q.2d 1764, 1997 WL 745036 (C.D.Cal.1997); *Cardservice Int'l, Inc. v. McGee,* 950 F.Supp. 737 (E.D.Va.1997).

## IV. Copyright Infringement

Plaintiff alleges that Defendant infringed its copyrighted web site by framing it within Defendant's own web site. As was the case with Plaintiff's trademark claims based on framing, this claim presents an issue of first impression. And here as well, due to the procedural history of the case, Defendant has not briefed the issue. Indeed, for reasons explained in Section V.B below, Plaintiff does not adequately brief the issue either. Hence, we are even less well-situated to decide this claim than we are to decide the trademark framing claim. However, for reasons explained in Section VI.B below, we need not decide it.

## V. Attorney Fees

 Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), provides in relevant part that a court "in exceptional cases may award attorney fees to the prevailing party," in a suit alleging violation of trademark rights under 15 U.S.C. § 1125(a). The Second Circuit has interpreted this language to mean that "[s]uch fees should be awarded only on evidence of fraud or bad faith," *Twin Peaks Prods., Inc. v. Publications Int'l Ltd.*, 996 F.2d 1366, 1383 (2d Cir.1993) (citation and internal quotation omitted), or on evidence of "willful infringement," *Bambu Sales, Inc. v. Ozak Trading, Inc.*, 58 F.3d 849, 854 (2d Cir.1995). Even if a court determines that a case is exceptional, however, it can deny an application for fees in exercise of its equitable discretion. *See, e.g., Dieter v. B & H Indus.*, 880 F.2d 322, 329 (11th Cir. 1989).

In support of its contention that ELA infringed its NYSSCPA mark willfully, fraudulently, and/or in bad faith, the Society points to the following four aspects of ELA's conduct:

1. ELA's placement of a hyperlink to the Society's web site on the home page of its web site shows that ELA "knew that the name 'NYSSCPA' belongs to the Society [and] its use of the Society's famous mark was an infringement." (Mem. Fees, at 9.)

2. ELA's placement of meta-tags using the Society's NYSSCPA mark in the HTML code of each of its three web sites "ensur[ed] that anyone seeking out the Society on the World Wide Web by using its well-known servicemark would be diverted to [ELA's] web site." (*Id.*)

3. The fact that the name "NYSSCPA" is "neither descriptive of the goods or services offered by the defendant, nor ... similar to or suggestive of the name or identity of [ELA shows] that [ELA's] only motive in appropriating that mark and using it in its business was to 'trade on the owner's reputation or to cause dilution of the famous mark.'" (*Id., quoting* 15 U.S.C. § 1125(c)(2).)

4. ELA's responding to the Society's cease and desist demand by (a) demanding $20,000 or free exhibitor's rights at the Society's trade fairs, and (b) informing the Society that it was considering selling the "nysscpa.com" domain name to one or the other of two CPA firms "constituted bad faith." (*Id.* at 10.)

In response to these contentions, ELA's founder and President, Brian Elias, provides the following explanations and justifications:

5. Mr. Elias (mistakenly) "believ[ed] that the availability of [nysscpa.com] for domain registration gave [ELA] certain rights to use the name." (Elias Aff. ¶ 7.)

6. ELA "thought [it] could dispel any confusion by stating on [its] home page that [it was] not affiliated with the Society, and by providing a link to [the Society's] site, nysscpa.org." (*Id.* at ¶ 7.)

7. Because ELA's web site was set up by Mr. Elias's secretary, he was unaware that meta-tags using the

NYSSCPA mark had been embedded in ELA's web site. (*See id.*)

8. In light of the disclaimer that ELA was not affiliated with the Society, and the display of ELA's own name on the home page of its web site, ELA believed that its use of the "nysscpa.com" domain name did not constitute trading on the reputation of the society. (*See id.* at ¶ 8.)

9. ELA's conduct was unintentional and in good faith because, having not contacted an attorney about these matters until he received the Society's Order to Show Cause on April 28, 1999, Mr. Elias proceeded on the basis of his well–intentioned–albeit uninformed and mistaken–beliefs about trademark law. (*See id.* at ¶ 11.)

In determining whether a defendant's infringing or diluting conduct was carried out in bad faith, courts can rely on the considerable jurisprudence that has been developed applying the "good faith" prong of the *Polaroid* test. This factor "looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product...." *Lang v. Retirement Living Publ'g Co., Inc.*, 949 F.2d 576, 583 (2d Cir.1991) (citations and internal quotations omitted). Furthermore, "[s]election of a mark that reflects the product's characteristics, request for a trademark search and reliance on the advice of counsel are factors that support a finding of good faith." *Id.* Similarly, a defendant's awareness of a plaintiff's use of a given mark to identify itself "can give rise to an inference of bad faith, [and][t]his inference [can be] bolstered by the further finding that [a defendant] proffered no credible innocent explanation for the [adoption of the plaintiff's mark]." *Centaur Communications*, 830 F.2d at 1228; *see also Mobil Oil*, 818 F.2d at 259 (noting that "actual or constructive knowledge may signal bad faith").

Our earlier determination that Defendant intentionally copied Plaintiff's mark takes us a considerable way toward determining that this copying was tinged with bad faith. As noted, Defendant's partners were clearly aware of the Society's mark, and, unlike ELA's other two domain names–"ericlouis.com" and "eric–louis.com"–the "nysscpa.com" domain name clearly was not selected because it "reflect[ed] [some] characteristic[]" of ELA. *Lang*, 949 F.2d at 583. Rather, it appears that ELA "adopted ... [it] with the intention of capitalizing on plaintiff's reputation and goodwill...." *Id.* As Mr. Elias emphasizes, ELA was a small, young company in the business of placing CPA's and other financial professionals. It was thus presented with the challenge of making such professionals aware of its services. The web site was presumably created for this purpose. What better way to attract CPA's to this site than to give it the "nysscpa.com" domain name, and embed the "NYSSCPA" meta-tag in the site's HTML code. After all, not only does the Society have upwards of 30,000 members, but its web site includes classified employment advertisements. Hence, any CPA interested in accessing the Society's online classifieds, but who was unaware of the Society's exact internet address–and thus tried to access the Society's site by means of "nysscpa.com" or "NYSSCPA"–would find himself at ELA's web site. As the Society succinctly puts the point, "[s]ince, by [Mr. Elias's] own admission, defendant had not developed a reputation to speak of, it simply helped itself to that of the plaintiff." (Mem. Fees, at 3.)

Furthermore, far from relying on the advice of counsel, Defendant appears to have made a point of not seeking such advice.

This brings us, finally, to the question of whether Defendant has offered a credible innocent explanation of its adoption of Plaintiff's mark. Considering first Defendant's adoption of the "nysscpa.com" domain name, the only explanation in view is

Mr. Elias's contention that he (mistakenly) believed that registering the "nysscpa.com" domain name gave him certain rights. This contention looks more like an explanation of Mr. Elias's decision to attempt to sell the name to Plaintiff than an explanation of why ELA *adopted* it in the first place. Charitably construed, however, the contention may be that he believed that his registration of the "nysscpa.com" domain name gave him a right to capitalize on the goodwill attached to Plaintiff's mark. So construed, this contention counts as a (barely) credible innocent explanation of defendant's initial adoption of the "nysscpa.com" domain name.

Turning to Defendant's use of the "NYSSCPA" meta-tag, Mr. Elias contends that ELA's web site was set up by his secretary, and that he was accordingly unaware that this meta-tag was embedded in the site's HTML code. The Court is willing to count this as a credible innocent explanation of Defendant's initial use of the "NYSSCPA" meta-tag.

Subsequent actions taken–and not taken–by Mr. Elias, however, are more difficult to view as entirely innocent. Indeed, Mr. Elias's professed naivete and ignorance becomes, at some point, positive evidence of willfulness and bad faith.

Consider first Mr. Elias's response to the Society's March 25th cease and desist demand. Even if Mr. Elias genuinely believed that ELA had done nothing wrong prior to this date, this demand put him on notice that ELA's use of the "nysscpa.com" domain name and the "NYSSCPA" meta-tag was potentially illegal. If Mr. Elias had then consulted an attorney and been advised that ELA's actions were arguably legal, ELA could plausibly maintain that its continued infringement and dilution of the Society's mark subsequent to the cease and desist demand was not willful. *See Cuisinarts, Inc. v. Robot–Coupe Int. Corp.*, 580 F.Supp. 634, 638 (S.D.N.Y.1984) ("[I]f a client seeks qualified counsel's advice in a timely manner, makes adequate disclosure to counsel, re-ceives counsel's opinion and then acts upon it, surely the Chancellor must pause before branding the client as a wilful, deliberate, fraudulent commercial thief . . . ."); *see also TakeCare Corp. v. Takecare of Oklahoma, Inc.*, 889 F.2d 955, 957 (10th Cir. 1989). But Mr. Elias chose a quite different course of conduct. Not only did he fail to seek the advice of counsel, but he proceeded to act on his uninformed belief that registration of the "nysscpa.com" domain name had given him certain rights by attempting to sell the name to the Society.

A strong case could be made that this conduct amounts to willfulness and bad faith on the ground that Mr. Elias's belief that he was acting within his rights was unreasonable under the circumstances. In *E. & J. Gallo Winery v. Consorzio del Gallo Nero*, 782 F.Supp. 472 (N.D.Cal. 1992), the defendant had received a cease and desist letter from the plaintiff, stating the plaintiff's belief that the defendant's use of a certain mark infringed the plaintiff's mark. *See id.* at 475. The court began its analysis of plaintiff's request for attorney fees by noting the Ninth Circuit rule that a defendant's "infringement may not be termed willful if [the defendant] reasonably believed that its use of [a mark] would not create a likelihood of confusion. . . ." *Id.* (*citing International Olympic Comm. v. San Francisco Arts & Athletics*, 781 F.2d 733, 738 (9th Cir.1986).) After then noting that the "[u]se of an infringing mark, in the face of warnings about potential infringement, is strong evidence of willful infringement," the court proceeded to hold that "[i]n light of the notice of likelihood of confusion from [plaintiff] . . . [defendant] was reasonably required to take more significant affirmative steps to ensure that its conduct would not constitute infringement. [Defendant] could have retained legal counsel to obtain an opinion as to the likelihood of infringement. The failure to consult trademark counsel prior to engaging in infringing conduct, where such consultation would be reasonable, supports a finding of willful

infringement." *Id.* at 475–76; *see also Blockbuster Videos, Inc. v. City of Tempe,* 141 F.3d 1295, 1300 (9th Cir.1998) (citation and internal quotation omitted) ("Infringement is not willful if the defendant might have reasonably thought that its proposed usage was not barred by the statute."); *Centaur Communications,* 830 F.2d at 1229 ("Although [defendant] claims that it reasonably doubted the validity of [plaintiff's] trademark, it failed to point to any investigation it made before it [engaged in the infringing conduct].").

Had Mr. Elias merely ignored the letter–believing, perhaps, that it was a mere bluff–his continued infringement might not rise to the level of bad faith. By taking positive action to assert his supposed rights, however, and doing so without seeking the advice of counsel, Mr. Elias arguably crossed the bad faith line.

Even if we assume, however, that Mr. Elias had not crossed this line on March 26, with his offer to sell the domain name to Plaintiff, he surely crossed it by April 6, 1999: the date Defendant received Plaintiff's second cease and desist demand. By this date, Defendant had had ample time to seek the advice of counsel. Rather than doing so, however, Plaintiff instead sought to bring further pressure on Plaintiff to purchase the "nysscpa.com" domain name. Furthermore, Defendant responded to this second cease and desist demand by continuing its two-pronged strategy of neither ceasing and desisting nor seeking the advice of counsel. On this date, therefore–at the latest–Mr. Elias's belief that ELA's actions were not violative of Plaintiff's trademark rights ceased being reasonable. As such, on this date–at the latest–Defendant's conduct commenced being willful and tinged with bad faith.

■ The Court finds, therefore, that ELA's infringing and diluting conduct subsequent to April 6, 1999 was willful and in bad faith. As such, Defendant's violation of Plaintiff's trademark rights is "exceptional," and the reasonable attorney fees incurred by Plaintiff in protecting these rights should be shifted to Defendant.

Defendant endeavors to avoid this conclusion by citing a number of attorney fee cases. Most of these cases, however, actually support the conclusion that Defendant's conduct was indeed willful and in bad faith.

Defendant first cites *Nikon, Inc. v. Ikon Corp.,* 803 F.Supp. 910 (S.D.N.Y.1992), where the court found that the defendant's infringement of the plaintiff's "Nikon" mark by use of the name "Ikon" did not amount to an exceptional case. As Plaintiff persuasively argues, *Nikon* is distinguishable because the court indicated that its determination was dependent on the fact that the two marks in question were not identical. *See id.* at 928 (emphasis added) (contrasting the court's denial of fees with *Centaur Communications Ltd. v. A/S/M Communications, Inc.,* 652 F.Supp. 1105, 1114–15 (S.D.N.Y.), *aff'd,* 830 F.2d 1217 (2d Cir.1987), where fees were granted upon a finding that defendant deliberately and knowingly misappropriated "the *identical mark* used by plaintiff"). Given that Defendant's "NYSSCPA" meta-tag is identical to Plaintiff's mark (and that Defendant's "nysscpa.com" domain name is nearly identical to Plaintiff's mark), *Centaur Communications* is more squarely on point than is *Nikon.*

Defendant then attempts to distinguish this case from the following three cases in which fees were awarded, arguing that its conduct was not nearly as egregious as that displayed by the respective defendants in these cases. Each of these cases, however, provides as much or more support for Plaintiff's contention that Defendant's conduct was exceptional. In *Aris Isotoner Inc. v. Dong Jin Trading Co., Inc.,* 1989 WL 236526, at *5 (S.D.N.Y.), the court found that defendant's conduct was willful because "it sold [gloves] with knowledge that they were intended to look like [plaintiff's] gloves and it intended to reap the benefit of that similarity." As we have concluded that Defendant ELA used the

"nysscpa.com" domain name and the "NYSSCPA" meta-tag with knowledge that they were intended to look like Plaintiff's NYSSCPA mark, and that it intended to reap the benefit of these similarities, *Aris Isotoner* actually *undermines* Defendant's position.

In *AAA, Inc. v. AAA Automobile Club of Queens, Inc.,* 1999 WL 97918, at *7 (E.D.N.Y.), the court found that the defendant acted in bad faith because (1) "Defendant's marks [are] confusingly similar [to] those of Plaintiff, [and] its chosen name mirrors that of Plaintiff's local affiliate almost to the letter"; (2) "Defendant advertises nearly all of the primary services promoted by Plaintiff under [its] marks, using the same media, despite undisputed evidence that Defendant does not actually provide some of those services;" (3) Defendant's "marks do not reflect any of the characteristics of Defendant's services, which is further indirect evidence of intentional copying"; (4) "Defendant was aware of the existence of Plaintiff's nearby affiliate before the filing of this lawsuit"; (5) "Defendant continued to advertise under [its] marks after receiving Plaintiff's cease and desist letter"; (6) Defendant continued to advertise "after service of the Complaint"; and (7) "Defendant has not provided any evidence of good faith." Given that (1), (3), (4), (5), and (arguably) (7) also describe Defendant ELA's conduct in this case, *AAA* arguably provides greater support for Plaintiff's position than it does for Defendant's position.

In *International Star Class Yacht Racing Assoc. v. Tommy Hilfiger, U.S.A., Inc.,* 80 F.3d 749, 753–54 (2d Cir.1996), the Second Circuit found that the defendant acted in bad faith because (1) it failed to conduct a full trademark search before it adopted its infringing mark; (2) it failed to conduct this search "in direct contravention of the advice of its attorneys"; and (3) it continued its infringing conduct after plaintiff initiated suit. In regard to (1), the court commented that "[s]uch willful ignorance should not provide a means by which Hilfiger can evade its obligations under trademark law." *Id.* at 754. Factors (1) and (2) do not clearly distinguish this case from the case before the Court, as we have found that Defendant ELA is guilty of a quite similar sort of willful ignorance, and failing to heed the advice of counsel is not clearly worse than failing to seek the advice of counsel in the first place.

Finally, Defendant relies most heavily on *Planned Parenthood Federation of America, Inc., v. Bucci,* 1997 WL 133313 (S.D.N.Y.), in which the defendant used a domain name, viz., "plannedparenthood.com," virtually identical to the plaintiff's "Planned Parenthood" mark, and a meta-tag, viz., "Planned Parenthood" identical to the plaintiff's mark. *See id.* at *1. Defendant argues that, despite the fact that the defendant's conduct in that case was more egregious than its own in this case, "the court in *Planned Parenthood* stated that it could not make a finding that the case was exceptional." (Mem. Opp. at 7.) Defendant conveniently fails to add, however, why the court declined to make such a finding, viz., because there was "insufficient evidence and/or legal briefing before" it. *Planned Parenthood,* 1997 WL 133313, at *12. As such, the case can not be used in support of Defendant's position.

Attorney fees were awarded, however, in a recent case in this district involving facts even more similar to the fact of this case than are the facts of *Planned Parenthood.* In *Toys R Us Inc. v. Abir,* 45 U.S.P.Q.2d 1944, 1946, 1997 WL 857229 (S.D.N.Y.1997), the defendant (a) intentionally copied the plaintiff's "Toys 'R' Us" mark by registering and using "TOYSRUS.COM" as a domain name, (b) offered to sell this domain name to the plaintiff, (c) threatened to establish an online toy store at this site, and (d) threatened to sell the domain name to third-party buyers. Judge Koeltl held that "because the defendants' conduct ... was willful, intentional, deliberate and in bad faith, the plaintiffs are entitled to recover attorneys' fees...."

*TOYS "R" US, Inc. v. Abir,* 1999 WL 61817,*1 (S.D.N.Y.).[10]

Having thus found that Plaintiff's reasonable attorney fees should be shifted to Defendant, we turn to the question of how much of Plaintiff's requested fees are reasonable.

## VI. Reasonableness of Plaintiff's Attorney Fees

To determine how much of Plaintiff's requested fee award is "reasonable" in a case such as this, courts employ the "lodestar" method of calculation; i.e., courts multiply the number of hours reasonably expended on the litigation by a reasonable hourly rate for attorneys and paralegals. *See City of Burlington v. Dague,* 505 U.S. 557, 559, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). Although the applicant bears the burden of submitting time records that support the hours worked and rates claimed, *see New York State Ass'n. for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1147 (2d Cir.1983), there is a strong presumption that the lodestar amount is reasonable, *see City of Burlington,* 505 U.S. at 557, 112 S.Ct. 2638. The party that asks the court to depart from the lodestar amount bears the burden of proving that such a departure is necessary to the calculation of a reasonable fee. *See Grant v. Martinez,* 973 F.2d 96, 101 (2d Cir.1992), *cert. denied,* 506 U.S. 1053, 113 S.Ct. 978, 122 L.Ed.2d 132 (1993).

### A. Bearing of the Preceding "Exceptional Case" Analysis

Plaintiff's lodestar calculation yields a total of $91,375.12 in attorney fees. Our preceding determination of when Defendant's infringing conduct became willful and in bad faith requires a significant reduction of this amount. Having found that

Defendant's conduct did not become willful and in bad faith until April 7, 1999, we cannot order the shifting of attorney fees incurred by Plaintiff prior to this point in time. *See Bowmar Instrument Corp. v. Continental Microsystems, Inc.,* 497 F.Supp. 947, 961 (S.D.N.Y.1980) (declining to award attorney fees incurred by plaintiff while case had been removed from active calendar and settlement negotiations were proceeding); *WSM Inc. v. Wheeler,* 223 U.S.P.Q. 1062, 1063–64, 1984 WL 1357 (M.D.Tenn.1984) (awarding so much of attorney fees as were incurred after date on which defendant's actions ceased being innocent); *Walt Disney Productions v. Jeffries,* 212 U.S.P.Q. 670, 672, 1981 WL 40578 (N.D.Ill.1981) ("The point at which the fees should start to run for [shifting] purposes is a point at which it can be said without doubt that the defendant knew her use of the mark was likely to cause confusion."). Hence, subject to the further adjustments made below, the Court finds that all attorney fees incurred by Plaintiff on or after April 7, 1999 should be shifted to Defendant. Specifically, deducting the fees charged by Skolnick, Hochberg & Bernfeld, P.C. prior to April 7, 1999 ($13,563.20) from the total amount charged ($50,266.18) leaves $36,702.98. Similarly, deducting the fees charged by McAulay Nissen Goldberg Kiel & Hand, LLP prior to April 7, 1999 ($5,337.50) from the total amount charged ($41,108.94) leaves $35,771.44. Adding these two residues together yields a sub-total of $72,474.42.

### B. Bearing of Plaintiff's Copyright Claim

It is not entirely clear what Plaintiff is seeking as a remedy for Defendant's alleged infringement of Plaintiff's copyrighted material. In Section VI.B of Plaintiff's

---

10. Our decision to award attorney fees in this case also accords with the Fifth Circuit's decision to decline such an award in *Moore Bus. Forms, Inc. v. Ryu,* 960 F.2d 486, 492 (5th Cir.1992), in which the court held that the defendant's continued use of a mark after

receipt of a cease and desist letter from the plaintiff "should not, without more, be considered exceptional." The "something more" the court had in mind was "bad faith in the adoption of the mark." *Id.*

Memorandum of Law in Support of Application for Monetary Damages and Attorneys Fees, Plaintiff (correctly) informs the Court that, under 17 U.S.C. §§ 504(b), 505, the prevailing party in a copyright infringement suit can recover (a) actual damages, (b) infringer's profits, (c) costs, and (d) attorney fees. Later, in Section VI.D, Plaintiff makes the following specific request: "Because the damages recoverable by the plaintiff are largely dependant upon the 'profits' realized by the defendant by reason of its unauthorized use of the copyrighted material owned by plaintiff, plaintiff respectfully requests that appropriate discovery and a hearing be directed for the purpose of assessing the damages, *including legal fees*, to which plaintiff is entitled by reason of defendant's infringement of plaintiff's copyright." (Emphasis added.) The Court is at a loss to understand why the amount Plaintiff expended on legal fees is dependant on a determination of Defendant's profits. Having made this connection, however, Plaintiff largely postpones briefing the issue whether it is entitled to an award of attorney fees until after the requested discovery. Specifically, Plaintiff does not recite the applicable standards for an award of attorney fees in an action for copyright infringement, nor, consequently, does the Society argue that these standards are satisfied in this case.

In any case, the Court denies Plaintiff's request for discovery and a hearing on the issue of Defendant's profits. We do so for the simple reason that our determination of Defendant's profits would have no effect whatever on our decision concerning how much money Defendant owes to Plaintiff. It would have no such effect because, as explained in the next section, we have determined that the amount of Plaintiff's attorney fees for which Defendant is liable as a result of its willful infringement and dilution of Plaintiff's mark exceeds the amount it should equitably be required to pay. Accordingly, we there reduce this amount for which Defendant is liable to an amount less likely to force Defendant out of business. Adding Defendant's profits to the full trademark liability amount would not cause us to change this lesser amount. *Cf. American Express Co. v. American Express Limousine Serv.*, 785 F.Supp. 334, 338 (E.D.N.Y.1992) (denying plaintiff's application for defendants' profits because "defendants have suffered enough to deter future infringement").

This denial of Plaintiff's request for discovery and a hearing on Defendant's profits has a decisive impact on the question whether we must consider Plaintiff's copyright claim. Given Plaintiff's decision to postpone briefing the issue whether that portion of attorney fees attributable to Plaintiff's copyright claim should be shifted to Defendant (i.e., until after the requested discovery and hearing on the issue of Defendant's profits), our denial of this request means that we have no reason to consider Plaintiff's (apparent) request for attorney fees based on Defendant's alleged copyright infringement. As such, we need not decide Plaintiff's novel "framing" theory of copyright infringement.

■ This conclusion raises the further question whether the portion of Plaintiff's attorney fees attributable to work on the copyright claim should be deducted from the sub-total of $72,474.42. The general rule is that "[t]he prevailing party in a multi-claim case which includes both Lanham Act and non-Lanham Act counts should be entitled to attorney fees only for work expended in prosecuting or defending the Lanham Act counts." 5 *McCarthy on Trademarks and Unfair Competition* § 30:103, at 178 (1999). However, "[i]f the claims are so intermingled that the factual basis and the legal theories are essentially the same, the court may award all of the prevailing party's attorney fees, making no deduction for the Lanham Act counts." *Id.* Given that Plaintiff's copyright claim is based on a different legal theory (and, to some extent, different facts) than are Plaintiff's trademark infringement and dilution claims, the portion of Plaintiff's attorney fees attributable to work on this

copyright claim will be deducted from the sub-total.[11] Accordingly, we reduce the interim total of $72,474.42 by five percent ($3,623.72), yielding a new sub-total of $68,850.70.

## C. Defendant's Objections

Defendant argues, on several grounds, that Plaintiff's fee request is excessive, and should, accordingly, be significantly reduced by the Court. We consider each of these grounds in turn.

First, and most important, Defendant argues that Plaintiff's decision to seek a temporary restraining order and preliminary injunction was unwarranted and thus excessive, because "plaintiff knew that we were a tiny company, and thus must have known that we could not afford to litigate." (Elias Aff. ¶ 14.) As such, "there were simple[r] steps that the plaintiff's lawyers could have taken ... to prod the defendant into involving a lawyer, such as asking to speak to its lawyer, or sending a draft complaint ...., [or][s]ervi[ng] ... a simple notice of motion or a complaint...." (Mem. Opp. at 9–10.) The suggestion appears to be that Plaintiff's choice of one of these more modest, less costly steps would have achieved the same results as the step actually taken by Plaintiff. We find this suggestion to be highly speculative, at best. Presented with Defendant's response to its initial cease and desist letter (viz., Defendant's $20,000 sale offer and later threat to sell the domain name to a third party) and Defendant's lack of response to its second cease and desist letter, Plaintiff reasonably concluded that nothing short of a temporary restraining order would succeed in "gain[ing] the defendant's attention." (Id. at 10.) Having ignored two cease and desist demands, Defendant is in no position to quibble about Plaintiff's litigation strategy.

In a similar vein, Defendant argues that the fees attendant to Plaintiff's decision to seek a temporary restraining order "far exceed any possible damage that the plaintiff could have suffered," (Elias Aff. ¶ 14.), and that "[t]he courts have exercised discretion not to award legal fees that were disproportionate to the result achieved," (Mem. Opp. at 9). In support of this contention, Defendant cites *Clarke–Reliance Corp. v. McNab, Inc.*, 1994 WL 62818 (S.D.N.Y.1994), in which–according to Defendant–the district court judge "took into account the fact that the defendant's profits were clearly very limited, and thus that the plaintiff's attorneys fees were excessive." (*Id.*) Although this description of *Clarke–Reliance* is accurate, the case cannot bear the weight Defendant attempts to place on it. The court refused to shift the fees incurred by plaintiff in preparation for the damages phase of a trial, because documents produced during the liability phase of the trial should have put plaintiff on notice that defendant was unlikely to have reaped significant recoverable profits. *Id.* at *6. According to Defendant, *Clarke–Reliance* thus suggests that we should likewise deny the fees Plaintiff incurred in this case because they far exceed any recoverable damages. This application of *Clarke–Reliance*, however, is misguided. *Clarke–Reliance*, at most, is merely a specific application of the general rule, stated by Defendant, that courts should not award legal fees that are disproportionate to the result achieved or, better, reasonably achievable.

Applying this general rule to the facts of this case yields the conclusion that the fees expended by Plaintiff should not be shifted insofar as they were disproportionate to Plaintiff's successful achievement of, first, a temporary restraining order, and, sec-

---

**11.** It could be argued that we should also reduce the fee award by the amounts attributable to work on (1) the state dilution claim, and (2) the Lanham Act infringement and dilution claims based on the "framing" theory. We decline to do so, however, because the legal theories and factual bases of each of these claims are "essentially the same" as those of Plaintiff's infringement and dilution claims based on Defendant's use of the "nysscpa.com" domain name and the "NYSSCPA" meta-tag.

ond, a permanent injunction. Unlike Defendant's suggestion that we must consider the proportionality between Plaintiff's fees and Plaintiff's recoverable damages, this issue of the proportionality between Plaintiff's fees and the injunctive relief achieved *is* a legitimate and proper inquiry. *See American Honda Motor Co., Inc. v. Two Wheel Corp.*, 918 F.2d 1060, 1064 (2d Cir. 1990) (affirming district court's reduction of fee request and agreeing that "the records submitted by counsel clearly indicate that they overlitigated this case … by expending time that was not reasonably required to obtain an injunction"); *cf. Gucci America, Inc. v. Rebecca Gold Enters., Inc.*, 802 F.Supp. 1048, 1051 (S.D.N.Y.1992) (awarding attorney fees to plaintiff seeking permanent injunction, where, due to the fact that "the infringement was limited in nature (and difficult to quantify precisely)," the "lion's share of [plaintiff's] losses were in the form of attorney's fees").

■ This (legitimate) issue of whether the fees incurred to achieve the TRO and the permanent injunction were excessive is, in fact, the concern of Defendant's third argument. Specifically, Defendant argues (a) that Plaintiff's primary counsel could have handled the case itself, i.e., that it was unnecessary for Skolnick, Hochberg & Bernfeld, P.C. to engage the services of McAulay Nissen Goldberg Kiel & Hand, LLP, (Finkelstein Aff. ¶ 9); (b) that, because two firms were involved, there was significant duplication of effort, (*id.*, citing *Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*, 1998 WL 274285 (S.D.N.Y.1998)); and (c) that far too much time was "devoted to basic research into the Lanham Act and Second Circuit injunction standards," (*id.* ¶ 10). We find concern (a) to be of little moment. Given that McAulay Nissen specializes in intellectual property law, whereas Skolnick Hochberg apparently does not, the latter's decision to engage the former's services appears reasonable. *See BASF Corp. v. Old World Trading Co.*, 839 F.Supp. 528,

533 (N.D.Ill.1993) (holding that the fees of a second firm would not automatically be disallowed where partner of second firm was an expert on the Lanham act, and noting that a "[p]laintiff is not barred from putting together as expert a legal team as possible"). As for (b), given the decision to retain a second firm, a certain amount of duplication is permissible; we agree, however, that the duplication in this case is somewhat excessive. Similarly, as to (c), we agree that the time spent on basic legal research is somewhat excessive. Hence, concerns (b) and (c) warrant some reduction of the amount requested.

In making this reduction, we need not ascertain precise figures for each of these two factors. Rather, we can "simply … deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application." *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 173 (2d Cir.1998) (citation and internal quotation omitted). We thus find that the sub-total of $68,850.70 should be reduced by an additional fifteen percent ($10,327.60) to $58,523.10.

■ Finally, Plaintiff argues that, even assuming that Plaintiff's attorney fees were reasonable, the Court may nonetheless deny Plaintiff's application–or at least reduce the requested amount–if we find that requiring Defendant to pay these fees would impose an undue burden on it. In support of this view, Defendant cites dicta from our opinion in *Fendi S.A.S. Di Paola Fendi E Sorelle v. Cosmetic World, Ltd.*, 642 F.Supp. 1143 (S.D.N.Y.1986). *Fendi* concerned an application for treble damages under 15 U.S.C. § 1117(b), which provides that courts are to award treble damages for the counterfeiting of trademarks, absent extenuating circumstances. Although we found no such extenuating circumstances in that case, we noted Congress's intention that "[w]here the defendant is an 'unsophisticated individual, operating on a small scale, for whom the imposition of treble damages would mean that he or she would be unable to support

his or her family,' treble damages may be inappropriate." *Id.* at 1147 (*citing* Joint Explanatory Statement, 130 Cong. Rec. H. 12,076 at 12,083 (Oct. 10, 1984)). Similarly, Defendant cites the following dicta from *Schieffelin & Co. v. Jack Co. of Boca, Inc.,* 850 F.Supp. 232, 253 n. 11 (S.D.N.Y. 1994): "Even if this case were an 'exceptional' one, there are sound reasons in the instant case to deny [plaintiff's] application. The infringement here was limited in nature, ... at a paltry gain to defendants. Furthermore, defendant ... is an unsophisticated individual, operating virtually out of his garage. An injunction against further sales alone will likely close his business. Requiring him also to pay [plaintiff's] attorneys would obviously impose a staggering burden upon him and his family."

These dicta, however, find limited resonance in the facts of this case. First, Defendant's "Principals" are hardly unsophisticated individuals operating out of a garage. On the contrary, Defendant's web site states that "[e]ach of our Principals are Certified Public Accountants and have worked for Big 5 CPA firms," (Elias Aff. Ex. B.), and Defendant's offices (as of April 1999) were located at 730 Fifth Avenue in the heart of Manhattan, (*see id.*). Second, Defendant does not claim that shifting the entire amount of Plaintiff's fees to ELA would render Mr. Elias (and/or other principals of ELA) incapable of supporting himself and his family. Third, Defendant does not claim that the permanent injunction to which it consented has forced ELA out of business.

Mr. Elias does (plausibly) claim, however, that, in light of the fact that ELA had total assets of $23,000 as of March 1999, shifting the entire $91,375 to ELA "would destroy [the] company." (Elias Aff. ¶ 13.) Therefore, in accord with the general spirit of the preceding dicta, the Court reduces the sub-total of $58,523.10 by an additional twenty percent ($11,704.62), yielding a final amount of $46,818.48–roughly half of the amount requested by Plaintiff.

The Court is aware that even this amount may very well "impose a tremendous hardship" on Defendant. (Elias Aff. ¶ 13). We are equally mindful, however, that failure to grant significant attorney fees in a case such as this would only encourage others to pursue the course charted by Defendant. Absent the risk of liability for a senior user's attorney fees, an individual or corporation would have everything to gain, and little to lose, by using a domain name and meta-tags similar or identical to a senior user's mark for so long as it takes the senior user to discover this use and apply for a temporary restraining order. Indeed, a decision not to award the senior user significant attorney fees in a case such as this would have the perverse effect of making it easier for the infringing junior user to extort a ransom payment from the senior user. Faced with a choice between (a) paying, say, $20,000 for the domain name, and (b) expending significantly more on the less than certain prospect of securing a preliminary injunction, the rational senior user will choose (a) every time–unless, that is, he has a reasonable chance of recovering a significant portion of the fees expended for (b). *See Playboy Enters., Inc. v. Baccarat Clothing Co.,* 692 F.2d 1272, 1275 (9th Cir.1982) (noting that "it is essential that the trial courts carefully fashion remedies which will take all the economic incentive out of trademark infringement"); *cf. Monsanto Chem. Co. v. Perfect Fit Prods. Mfg. Co.,* 349 F.2d 389, 398 (2d Cir.1965) (Moore, J., concurring and dissenting) (citation and internal quotations omitted) ("It seems scarcely equitable, however, for an infringer to reap the benefits of a trademark he has stolen, force the registrant to the expense of litigation, and then escape payment of damages on the theory that the registrant suffered no loss. To impose on the infringer nothing more serious than an injunction when he is caught is tacit invitation to other infringement.").

## Conclusion

For the reasons stated above, Plaintiff's application for an award of attorney fees is

granted in the amount of $46,818.48, and Plaintiff's request for discovery and a hearing on the issue of Defendant's profits is denied.